UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,

          v.                                    CASE NO. 11 Cr.665 (RPP)

H. Clayton Peterson,

             Defendant.

------------------------------------------------------------x

## MEMORANDUM IN AID OF SENTENCING OF H. CLAYTON PETERSON

**INTRODUCTION**

Defendant H. Clayton Peterson respectfully submits this memorandum in connection with his sentencing.  The Presentence Report ("PSR"), consistent with the stipulated range contained in the plea agreement, concludes that the applicable Sentencing Guidelines range is 12-18 months (Zone C).  However, the PSR recommends a non-Guidelines sentence, pursuant to 18 U.S.C. § 3553(a), of two-years probation, with three months of home confinement, and certain additional mandatory and special conditions.

As is evident from the PSR and letters submitted on his behalf, Mr. Peterson is a fundamentally good person who has led an otherwise exemplary life.  Mr. Peterson, however, as he has fully acknowledged, made a grievous mistake and fell prey to a wholly uncharacteristic lapse in judgment.  This serious error, though, which occurred over the course of several days, amounted to a brief deviation from a life replete with honesty and integrity.  Given this context, the severe consequences Mr. Peterson faces as a convicted felon alone, including the irreparable damage to a reputation built over a lifetime, we respectfully submit that the sentencing recommendation contained in the PSR is sufficient to achieve the goals of 18 U.S.C. § 3553(a).  We therefore respectfully request that, pursuant to that statute, the Court impose the recommended non-incarceratory sentence.

**BACKGROUND**

I.      Procedural Background

On August 5, 2011, Mr. Peterson entered a plea, pursuant to a plea agreement, to a two-count Information charging him with one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and one substantive securities fraud count in violation of 15 U.S.C. §§ 78j(b) and 78ff, Title 17 C.F.R. Section 240.10b-5.  The plea agreement contains a stipulated

Guidelines calculation resulting in an Offense Level of 13.  Because Mr. Peterson has no

criminal history points, his stipulated sentencing range is 12-18 months, which, because it is in

Zone C, can be satisfied by a split sentence, including 6 months' incarceration and 6 months'

home confinement.  The plea agreement expressly permits Mr. Peterson to argue for a non-

Guidelines sentence pursuant to 18 U.S.C. 3553(a).

II.      Personal Background

        Mr. Peterson was raised in Mankato, a small town in north central/western Kansas with a

population of approximately 1000.[1]  He led a happy childhood with loving and supportive

parents.  However, the economic circumstances in which he grew up were extremely modest,

and he began working as soon as he was able.  From this modest background, Mr. Peterson

attended Kansas State University and earned a B.S. in accounting in 1967.

        After graduation, Mr. Peterson served in Vietnam in one of the most decorated Army

combat units, The First Air Calvary Division.  Mr. Peterson was tasked with delivering pay to

soldiers; he did this by traveling in helicopters, with a bag containing the funds handcuffed to his

wrist.  This task speaks volumes about Mr. Peterson.  First, even from this early period in his life,

Mr. Peterson was recognized as a person of integrity who could be trusted with the maintenance

and distribution of large sums of money.  Second, helicopter flights were particularly hazardous

and susceptible to enemy fire.  For his service to his country, Mr. Peterson was awarded a

Bronze Star.

        After his honorable discharge, Mr. Peterson began working as an accountant at Arthur

Andersen.  Over the next 33 years he steadily worked his way up its hierarchy, culminating with

---

[1] The PSR indicates that Mr. Peterson was born in Washington, D.C., which is correct, but states that he and his
family moved to Kansas while he was in 4th grade.  In fact, the Peterson's moved to Kansas when Mr. Peterson
was 3 months old.

2

his service as the Managing Partner of the Denver office (1989-2002), and the Regional

Managing Partner for the Audit practices of Dallas, Oklahoma City and Tulsa (1999-2002); in

these capacities he oversaw approximately 600 employees. During this period he married, and

eventually divorced his first wife, with whom he had two children, Drew and Carrie. While the

divorce was undoubtedly difficult for the family, and Mr. Peterson's dedication to his job

required long hours at work, he was nonetheless a loving and caring father devoted to both his

children. As Drew writes in his letter to the Court:

> Unlike what can often happen to individuals who have a successful career, my
> father never neglected his relationship with me and my older sister. To the
> contrary, his relationship with us always came first. Even after my parents
> divorced when I was five years old, my sister and I regularly saw my father.[2]

(Ex. 2.)

In particular, Drew came to live with his father during high school, and the two grew

extremely close, such that Mr. Peterson considers Drew to be his best friend. As set forth in

more detail below, the circumstances of this case have now put that relationship under strain –

another potentially devastating consequence for Mr. Peterson.

The example he set while at Arthur Andersen is extraordinary. As the many letters in

support of Mr. Peterson attest, Mr. Peterson was a true mentor and paragon of integrity. One

friend of Mr. Peterson's, who worked with him at Arthur Andersen, writes that he "never

witnessed an instance in which Clayton made any decision to jeopardize his integrity or to cut

corners on highest decision-making issues. His record was always unblemished and he had the

highest integrity for his work, his adherence to sound principles, and his stellar ethical

performances." (Ex. 6.) Mr. Peterson not only fostered the professional development of those he

---

[2] Copies of letters in support of Mr. Peterson have not been filed but have been provided to both the Court and the
government.

worked with, but also instilled in others a commitment to supporting the community around them. As one close friend and former colleague writes:

> Clayton championed and strongly supported the work of all Andersen partners and employees in the Denver community. His view, often repeated, was that we all got a lot out of our community, and it was equally important to give as much, or more, back . . . For me personally, Clayton encouraged me to get involved with Big Brothers Big Sisters of Colorado . . . Over the last twenty-plus years, I have become deeply committed to [the organization] and . . . now serve as the National Chairman of Big Brother Big Sisters of America. [W]ithout Clayton's leadership I would not have become as involved in or be as passionate about civic and charitable endeavors.

(Ex. 4.) His commitment to the community was not limited to inspiring others; he is an active participant himself. For example, one close friend of twenty years, who has two adopted children with whom Mr. Peterson is especially close, describes Mr. Peterson as a person with the "most tender and kind heart I have ever seen in a friend." When the adoption agency "held a fundraiser several years ago, 75% of the contributions came from Clayton." (Ex. 5.)

Mr. Peterson's conduct upon the demise of Arthur Andersen (something he had nothing to do with), also attests to his character. While Mr. Peterson had highly valuable client contacts and could have simply gone elsewhere and commanded a significant salary, he instead forewent any such opportunities so that he could secure employment for the 600 plus employees in his charge. A former client and close friend explains:

> [Clayton] took it upon himself to find a Denver accounting firm to absorb the Denver-based Arthur Andersen professional and support staff. Clayton Peterson relinquished an attractive employment package offered by the acquiring firm to make the economics of the deal work. The final outcome resulted in continuity of employment for essentially all working in the Denver office. In addition to foregoing continued employment in public accounting, Clayton Peterson also lost the retirement savings he had accumulated over more than 30 years with Arthur Andersen.

(Ex. 1.)

His tireless and selfless efforts on behalf of the out-of-work partners, other auditors and staff members is nothing short of remarkable, and instilled a deep sense of loyalty and gratitude among this fortunate group. As his son Drew reports: "[s]o many of his former colleagues at Arthur Andersen, most of whom I did not really know that well or at all, stop and tell me how instrumental my father was in securing them a new job when Andersen went out of business or how he gave them their first job." (Ex. 2.)

After Mr. Peterson's time at Arthur Andersen came to an end, he continued to work, including by serving on various boards, including as Audit Committee Chair.[3]  These appointments reflect the esteem in which he is held. In addition, he spends a great deal of time as a doting grandfather to Brooke, Carrie's seven year old daughter. As Carrie eloquently writes, Brooke enjoys a special relationship with Mr. Peterson, and his absence from her life during a period of incarceration would be devastating to her. (Ex. 9.)

## ARGUMENT

I.     A Sentence Below the Guidelines Is Appropriate in this Case

18 U.S.C. § 3553(a) requires a court to impose a sentence that is "sufficient, but not greater than necessary." We respectfully submit that, consistent with the recommendation by the Probation Office, a non-Guidelines sentence is appropriate as there are significant mitigating factors that, while not a part of the Guidelines analysis, are contemplated by section 3553(a). These significant mitigating factors, we submit, justify a sentence of probation, including a period of home confinement, with no term of imprisonment.

---

[3] The PSR correctly reflects that from 2003 to 2005 Mr. Peterson served as a consultant to the Kim Magness Estate. However, his compensation ranged from $150,000 to $300,000 per year, not $150,000 to $1.3 million as indicated in the PSR.

A.     The Offense Conduct

While serving on Mariner Energy Corp.'s ("Mariner") Board of Directors, Mr. Peterson

became aware that Apache Corporation ("Apache"), had made an offer to acquire Mariner.[4]  Mr.

Peterson soon after, on or about April 8, 2010, instructed his son Drew, a money manager who

had proprietary trading authority over Carrie's account, to purchase stock on her behalf; Drew

then did so.  On the same day, Mr. Peterson directed his son to purchase additional Mariner stock

for Carrie, and Drew followed this instruction as well.[5]  Drew also purchased Mariner stock for

himself, and on behalf of an investment club in which he was a member.  On April 12, 2010, Mr.

Peterson informed Drew that Mariner was indeed going to be acquired soon.  Shortly after the

Apache-Mariner acquisition was announced on April 15, 2010, Drew sold the Mariner stock he

purchased on his, his investment club's, and Carrie's behalf for a gain of approximately $60,000.

Mr. Peterson, pursuant to the plea agreement, has accepted responsibility for all of these

transactions.

Mr. Peterson became aware of the criminal investigation into this conduct in or about

June 2011.  He fully recognized that his conduct was wrong and unlawful, and never considered

any course other than one in which he would accept responsibility for his actions.  In short order

he agreed to plead to the instant Information.

B.     A Reduced Sentence Is Warranted under 18 U.S.C. § 3553(a)

In sentencing a defendant, the Court "shall impose a sentence sufficient, but not greater

than necessary" to comply with the sentencing goals set forth in section 3553(a).  18 U.S.C. §

3553(a).  Those goals reflect the need to consider not only the nature of the offense itself and the

---

[4] Both Mainer and Apache common stock were traded on the New York Stock Exchange.

[5] Carrie had no knowledge of these purchases.

individual defendant, but also the general need for the sentence imposed.  Specifically, the Court

shall consider, among other factors:

> (1) the nature and circumstances of the offense and the history and characteristics
>     of the defendant;
> (2) the need for the sentence imposed –
>     (A) to reflect the seriousness of the offense, to promote respect for the law,
>         and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational
>         training, medical care, or other correctional treatment in the most effective
>         manner;
> (3) the kinds of sentences available[.]

*Id.*  An analysis of the relevant factors in the context of this case indicates that a sentence below

the applicable Guidelines range is more than sufficient to meet the goals of sentencing.

### 1.  The Nature and Circumstances of the Offense Warrants a Reduced Sentence

Without question, Mr. Peterson's conduct was wrong, and he was aware of the wrongful

nature of his conduct.  He is now a convicted felon as a result.  However, Mr. Peterson's very

serious lapse in judgment, we submit, should be viewed in context.  The offense conduct

occurred over the course of several days.  In contrast, his preceding sixty-four years were marked

by nothing but honesty and integrity.[6]  This case is markedly different from many of the insider

trading cases that have made headlines recently, in which there was systematic sharing of

material non-public information in exchange for payment.  Mr. Peterson had never before

engaged in any similar activity, and indeed has an otherwise unblemished record in his

profession.

---

[6] For the avoidance of doubt, we are not seeking a downward departure pursuant to U.S.S.G. §5K2.20 for aberrant
behavior, and stand fully behind the stipulated guidelines range contained in the plea agreement.  The
arguments set forth in this section are advanced in support of a non-Guidelines sentence pursuant to 18 U.S.C. §
3553(a).

2. <u>Mr. Peterson's History and Personal Characteristics Support a More Lenient Sentence</u>

With the notable exception of this offense, Mr. Peterson has led an exemplary life. From humble beginnings he reached the peak of his profession, and did so through dint of hard work and dedication. All the while he never lost sight of what he considered to be his obligation to give back to the community, and inspired others to do so as well. His extraordinary efforts to secure employment for all 600 employees at Arthur Andersen who worked for him, without regard to seniority or position, and at his own personal expense, further speak to his character. Moreover, his brave and dedicated service to his country during war time further reflect the out-of-character nature of Mr. Peterson's current predicament.

The notion that is repeated throughout the letters of support is how aberrant Mr. Peterson's conduct was in this instance – that he is a truly fine person with the highest ethical standards who on this occasion made a serious error in judgment. As someone who has known Mr. Peterson for 26 years states:

> Your Honor, Clayton deserves to be punished for his acts, but if there were ever a time when the complete picture of a person's life and career should be viewed as a whole as opposed to looking through the narrow lens of a small window in time, I would suggest that this may be such a time.

(Ex. 3.)

We respectfully submit that this critical context should be taken into account and weighs strongly in favor of a non-incarceratory sentence.

In addition, we submit that the likelihood of recidivism is nil. Not only does the context above speak to the fact that Mr. Peterson will never commit another offense, but as a convicted felon Mr. Peterson will simply never be in a position to obtain material non-public information again.

8

To be clear, we are not suggesting that Mr. Peterson's conduct be condoned or excused by our request for a sentence of probation. Quite the contrary, Mr. Peterson's conduct was wrong, and he has justifiably become a convicted felon. As such, he has lost all ability to secure future income in his profession. Through this conviction and the resulting publicity, he has also caused and will suffer irrevocable damage to the sterling reputation he had worked so hard to achieve. Another significant by-product of his conviction is that the close relationship with his son, Drew, has understandably become more complex. While there is deep and abiding love between the two and our hope is that they continue to remain close, there is no doubt that this set of circumstances will have a lasting effect.

Mr. Peterson is deeply remorseful for his conduct. We submit that, under the circumstances, one serious mistake that has and will have lasting consequences for Mr. Peterson is significant punishment enough, and that a term of incarceration is unnecessary to achieve the ends of justice.

## **CONCLUSION**

For the forgoing reasons, Mr. Peterson respectfully requests that the Court impose a non-Guidelines sentence consistent with the recommendation contained in the PSR.

Dated: October 3, 2011

      New York, New York

                     Respectfully submitted,

                              /s/  Steven R. Glaser
                              Steven R. Glaser
                              Skadden, Arps, Slate, Meagher & Flom LLP
                              4 Times Square
                              New York, New York 10036
                              (212) 735-3000
                              StevenGlaser@skadden.com

                              Patrick J. Burke
                              Patrick J. Burke, P.C
                              999 18th Street, Suite 2055
                              Denver, Colorado 80202
                              (303) 825-3050
                              (303) 825-2992 fax
                              patrick-j-burke@msn.com

                              *Attorneys for H. Clayton Peterson*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 3rd day of October, 2011, I caused a true and correct copy of the foregoing to be filed electronically using the CMF/ECF system, which will send notification to the following:

Michael Levy
Assistant U.S. Attorney
U.S. Attorney's Office for the
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
Michael.Levy@usdoj.gov
Attorney for the Government

Dated: October 3, 2011
       New York, New York

                                                By:    /s/ Steven R. Glaser
                                                       Steven R. Glaser